IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| WILLIAM O. BREEDLOVE, III | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CAUSE NO.   3:26-cv-831 |
| | § | |
| CORINE BREEDLOVE and | § | |
| ALEX A. BONNET, | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff William O. Breedlove, III, and files this original complaint for personal injury against Defendants Corine Breedlove and Alex A. Bonnet and for cause of action pleads as follows:

### PARTIES

1.      Plaintiff William O. Breedlove III is an individual, resident, and citizen of the State of Colorado.

2.      Defendant Corine Breedlove is an individual and citizen of the State of New Mexico and may be served with process at 2260 Laguna Drive, Las Cruces, New Mexico 88005.

3.      Defendant Alex A. Bonnet is an individual and citizen of the State of Texas and may be served with process at 7773 Enchanted Ridge Drive, El Paso, Texas 79911.

### JURISDICTION AND VENUE

4.      This Court has jurisdiction under 28 U.S.C § 1332, as this is a civil action between citizens of different states and the amount in controversy exceeds $75,000.

5.      Venue is appropriate under 28 U.S.C. § 1391(b)(1) and (2) because Mr. Bonnet resides in this district, and a substantial part of the events or omissions giving rise to Mr. Breedlove's claims occurred in this District.

## FACTS

6.      William O. Breedlove, III and Corine Breedlove are spouses. Mr. Breedlove is 92 years old.

7.      Alex A. Bonnet is Corine Breedlove's adult child from a previous relationship.

8.      Over the last few years, Mrs. Breedlove insisted on being Mr. Breedlove's sole caregiver, refusing repeated offers by Mr. Breedlove's children from a previous marriage—Rusty, Kim, and Shawn—to provide for home care as much as needed (up to full-time support) and, if it became necessary, to enlist the help of an in-home nurse.

9.      Appealing to her own PhD in nursing, Mrs. Breedlove represented having the requisite expertise and the capacity to take full responsibility for Mr. Breedlove's care.

10.     Instead of using her skills as a nurse to care for Mr. Breedlove, Mrs. Breedlove, without any medical authority and against medical advice, stopped providing Mr. Breedlove with his prescribed thyroid medication, denied him access to his medical provider, and intentionally neglected and abused Mr. Breedlove, leading to a severe decline in Mr. Breedlove's health.

11.     As a result of Mrs. Breedlove's act and/or omissions, Mr. Breedlove began suffering from memory loss, depression, difficulty walking, and changes in his voice— symptoms that Mrs. Breedlove, holding a PhD in nursing, knew would occur.

12.     On March 7, 2025, Mr. Breedlove was taken to Memorial Medical Center ("Memorial") in Las Cruces, New Mexico for alleged suicidal ideations after Mrs. Breedlove claimed that she found Mr. Breedlove attempting to harm himself. In reality, Mrs. Breedlove and her son Mr. Bonnet orchestrated this entire episode as a basis to remove Mr. Breedlove from his home and steal his property.

13.     Mr. Breedlove was suffering from malnourishment and severe, overt hypothyroidism—the condition that was supposed to be treated by the medication Mrs. Breedlove withheld. All of Mr. Breedlove's sudden symptoms were caused by his untreated hypothyroidism and the denial of access to medical providers.

14.     In the months before Mr. Breedlove was admitted to the hospital, Mrs. Breedlove had secretly closed her bank account and opened a new account without Mr. Breedlove's signature authority.

15.     On December 19, 2024, Mrs. Breedlove wrote a $10,000 check to Mr. Bonnet, who cashed the check. On March 9, 2025, Mrs. Breedlove wrote a $1,000 check to Mr. Bonnet, who cashed the check. On March 25, 2025, Mrs. Breedlove wrote a $2,000 check to Mr. Bonnet. This check was intercepted and not cashed.  Mrs. Breedlove did not have Mr. Breedlove's consent—and Mr. Breedlove did not authorize Mrs. Breedlove— to transfer Mr. Breedlove's money to Mr. Bonnet.

16.     On March 12, 2025, Mr. Bonnet drove Mrs. Breedlove and Mr. Breedlove from Las Cruces, New Mexico to El Paso, Texas, where Mrs. Breedlove and Mr. Bonnet admitted Mr. Breedlove to Cimarron against his will.

17.    When admitting Mr. Breedlove, Mrs. Breedlove and Mr. Bonnet falsely told the Cimarron staff that Mrs. Breedlove had legal power of attorney ("POA") to make personal and medical decisions for her husband but failed to provide any documentation.

18.    Although Mr. Breedlove had executed a POA in 2021, naming Mrs. Breedlove as his agent (the "2021 POA"), this 2021 POA only became effective upon Mr. Breedlove's incapacity as declared by Mr. Breedlove's personal physician and confirmed by a second physician.

19.    Mr. Breedlove was never incapacitated nor declared as such. Thus, despite her representations to Cimarron, Mrs. Breedlove had no legal authority to make personal or medical decisions without Mr. Breedlove's express consent.

20.    Indeed, Mrs. Breedlove knew she did not have a valid POA, as she had tried to assert the 2021 POA while Mr. Breedlove was in Memorial's care, but the hospital confirmed that it was ineffective because Mr. Breedlove had not been determined to be incapacitated.

21.    As soon as Mr. Breedlove was admitted to Cimarron, he began making daily calls to his children asking to go home.

22.    After Mrs. Breedlove admitted Mr. Breedlove, the Cimarron staff received a call from a hospice service requesting a referral, initiated by Mrs. Breedlove and Mr. Bonnet. When Cimarron tried to contact Mrs. Breedlove to understand her plans for Mr. Breedlove, they could not reach her, so they contacted Mr. Bonnet. Mr. Bonnet informed the Cimarron staff that Mrs. Breedlove was sick and did not want to be involved.

23.    Mrs. Breedlove would not agree to releasing her husband from Cimarron, insisting that she was no longer healthy enough to care for him.

24.     Despite the children's assurances that there would be around-the-clock in-home care for Mr. Breedlove to relieve any burden on Mrs. Breedlove, particularly in light of her health concerns, Mrs. Breedlove and Mr. Bonnet continued to oppose Mr. Breedlove's return home, insisting that their three-bedroom, three-bathroom house was too small to accommodate in-home caregivers. Mrs. Breedlove also continued to insist her own ailments made Mr. Breedlove's return home impossible.

25.     Mr. Breedlove was determined to leave Cimarron, so on March 21, 2025, he executed a new durable POA and a medical POA, explicitly revoking the inoperable 2021 POA and naming his son Rusty as his agent. The new POA granted Rusty immediate legal authority to make personal decisions for Mr. Breedlove and legal authority to make medical decisions for his father if Mr. Breedlove was declared incapacitated.

26.     On March 26, 2025, Mrs. Breedlove sent Cimarron the 2021 POA and followed up with a phone call, informing Cimarron that she could not take her husband home but would be open to placing him in a "foster home" in El Paso. During this call, Mrs. Breedlove also told Cimarron not to share any of Mr. Breedlove's medical information with his children or allow them to make any medical decisions. Mrs. Breedlove insisted that her husband's medical information was only to be shared with her or Mr. Bonnet.

27.     Two days later, Mr. Breedlove's counsel sent written notice to Mrs. Breedlove and Mr. Bonnet informing them of the new POAs. The notice also explained that Mrs. Breedlove never had legal authority to make medical or personal decisions for Mr. Breedlove and demanded that Mrs. Breedlove and Mr. Bonnet allow Mr. Breedlove to return home, where his children had arranged for him to receive full-time care.

28. Shortly thereafter, Mr. Breedlove's children took him home.

29. During this time, Mr. Breedlove discovered that Mrs. Breedlove had written unauthorized checks to Mr. Bonnet from his account totaling $13,000 and removed Mr. Breedlove's trust documents from their safe-deposit box.

30. When Mr. Breedlove was admitted to Cimarron, he was confused and struggled to even walk on his own, with blood tests suggesting that he was suffering from severe malnutrition. Since his release, with proper food and medication, Mr. Breedlove has made significant progress. His mood and condition are vastly improved.

## CAUSES OF ACTION

### Count I
### Negligence

31. Mr. Breedlove incorporates by reference the allegations in all preceding paragraphs.

32. Mrs. Breedlove breached her duty of care by discontinuing Mr. Breedlove's thyroid medication, denying him access to his medical providers, neglecting his physical and mental needs while he was under her care, and admitting him to Cimarron against his will.

### Count II
### Negligence Per Se/Elder Abuse

33. Mr. Breedlove incorporates by reference the allegations in all preceding paragraphs.

34. As a 92-year-old man, Mr. Breedlove is an elderly individual, as defined by Texas Penal Code § 22.04(c). Mrs. Breedlove and Mr. Bonnet, therefore, were negligent per se, as their actions violated multiple Texas statutes criminalizing elder abuse, such as by:

6

a.    committing "financial abuse" by wrongfully appropriating and retaining Mr. Breedlove's money and property and/or assisting in the wrongdoing (*id*. § 32.55(a)(2));

b.    committing "financial exploitation," as family members with "a relationship of confidence or trust with" Mr. Breedlove, by "coercion, manipulation, threats, intimidation, misrepresentation, [and] the exerting of undue influence," including "breach of a fiduciary relationship" and misuse of a power of attorney (*id*. § 32.55 (a)(3));

c.    "the unauthorized appropriation, sale, or transfer" of Mr. Breedlove's money and property, and the "knowing and intentional failure" to use Mr. Breedlove's resources for his "support and maintenance" (*id*. § 32.55(a)(3)(A)–(D));

d.    "intentionally, knowingly, or recklessly caus[ing] the exploitation" of an "elderly individual," *id*. at § 32.53(b), by improperly using Mr. Breedlove's resources for their personal benefit (*id*. § 32.53(a)(2)); and

e.    "misapplication of fiduciary property," while purporting to act as fiduciaries for Mr. Breedlove (*id*. at §§ 32.45(a)(1)(C), (b)).

35.    Mrs. Breedlove and Mr. Bonnet each have relationships of confidence or trust with Mr. Breedlove, *id*. § 32.55(b)(1), and their actions constitute, at a minimum, a felony of the third degree, including for the unauthorized transfer of $11,000 from Mr. Breedlove's account. *Id*. § 32.55(d)(4).

## Count III
## Gross Negligence

36.    Mr. Breedlove incorporates by reference the allegations in all preceding paragraphs.

37.    Mrs. Breedlove and Mr. Bonnet, by their various acts and omissions, put Mr. Breedlove at extreme risk of serious harm or even death by discontinuing his thyroid medication, neglecting his basic physical and mental health needs for over a year, either failing to seek medical attention and counseling for Mr. Breedlove's alleged suicidal ideations or completely fabricating an incident of attempted self-harm as a basis to remove him from his home, and then admitting him to Cimarron against his will.

38.    Mrs. Breedlove had full awareness of the risk of denying Mr. Breedlove his medication, and both Mrs. Breedlove and Mr. Bonnet acted with knowing indifference to Mr. Breedlove's rights, safety, and welfare.

## Count IV
## Breach of Fiduciary Duty

39.    Mr. Breedlove incorporates by reference the allegations in all preceding paragraphs.

40.    Mrs. Breedlove and Mr. Bonnet breached their duty to Mr. Breedlove when they conspired to withhold his medication, deprive him of medical care, fabricate a mental health crisis, fabricate legal authority to admit Mr. Breedlove into a long-term care facility, steal $11,000, and prohibit Mr. Breedlove from returning to his home while Mr. Bonnet lived there without Mr. Breedlove's consent.

**Count V**
**Fraud**

41.    Mr. Breedlove incorporates by reference the allegations in all preceding paragraphs.

42.    Mrs. Breedlove and Mr. Bonnet falsely represented that Mrs. Breedlove was authorized to make personal and medical decisions for Mr. Breedlove under an ineffective POA when they admitted Mr. Breedlove to Cimarron, wrote unauthorized checks from his account, and removed his trust documents from the couple's safe-deposit box so that Mr. Breedlove would not have access to the documents.

43.    Mrs. Breedlove and Mr. Bonnet intended for the staff at Cimarron and the bank to act in reliance on their misrepresentations, and they did.

44.    Acting in reliance on these misrepresentations, Cimarron (1) admitted Mr. Breedlove without his consent and (2) refused to release Mr. Breedlove despite his repeated demands, and the bank allowed Mrs. Breedlove and Mr. Bonnet to take Mr. Breedlove's money and property.

**Count VI**
**Constructive Fraud**

45.    Mr. Breedlove incorporates by reference the allegations in all preceding paragraphs.

46.    Constructive fraud occurs where there is a breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship.

47.    Mrs. Breedlove owed Mr. Breedlove fiduciary and/or confidential-relationship duties arising from her asserted agency authority under the 2021 POA and her conduct in holding herself out as authorized to act on Mr. Breedlove's behalf, and from the relationship of trust and confidence Defendants exploited as alleged above.

9

48.    Mrs. Breedlove and Mr. Bonnet breached their duty to Mr. Breedlove when they conspired to withhold his medication, deprive him of medical care, fabricate a mental health crisis, fabricate legal authority to admit Mr. Breedlove into a long-term care facility, steal $11,000, and prohibit Mr. Breedlove from returning to his home while Mr. Bonnet lived there without Mr. Breedlove's consent.

## Count VII
## False Imprisonment

49.    Mr. Breedlove incorporates by reference the allegations in all preceding paragraphs.

50.    Mrs. Breedlove and Mr. Bonnet willfully detained Mr. Breedlove at Cimarron without his consent and without legal authority to make personal or medical decisions on his behalf.

## Count VIII
## Conspiracy

51.    Mr. Breedlove incorporates by reference the allegations in all preceding paragraphs.

52.    Mrs. Breedlove and Mr. Bonnet conspired to deny Mr. Breedlove his thyroid medication and neglect his basic needs for over a year, causing his physical and mental condition to rapidly deteriorate to the point that he was confused, malnourished, and could barely walk, suffering from the effects of severe, untreated hypothyroidism.

53.    Mrs. Breedlove and Mr. Bonnet also conspired to fabricate a story of attempted suicide as a basis to remove Mr. Breedlove from his home. They then admitted him to Cimarron against his will and ignored his repeated pleas to return to his home.

**Count IX**
**Conversion**

54.    Mr. Breedlove incorporates by reference the allegations in all preceding paragraphs.

55.    Mrs. Breedlove and Mr. Bonnet wrongfully exercised dominion or control over Mr. Breedlove's $11,000.00.

### DAMAGES

56.    As a direct and proximate result of Defendants' acts and omissions described above, Mr. Breedlove suffered the following injuries and damages:

    a.    physical pain and mental anguish in the past and future;

    b.    physical impairment in the past and future;

    c.    medical expenses in the past and future; and

    d.    monetary damages.

57.    Because Mrs. Breedlove and Mr. Bonnet acted by fraud and with gross negligence, Mr. Breedlove is entitled to punitive damages under TEX. CIV. PRAC. & REM. CODE § 41.003.

### JURY DEMAND

58.    Plaintiff demands a trial by jury on all issues triable under Rule 38 of the Federal Rules of Civil Procedure.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests entry of judgment granting the following in personam legal and equitable relief consistent with this action for tort damages, and not including any divorce, alimony, child-custody, probate, estate-administration, trust-administration, or other in rem relief:

11

a.      actual damages in an amount greater than $75,000,

b.      punitive damages pursuant to TEX. CIV. PRAC. & REM. CODE § 41.003;

c.      costs and reasonable attorneys' fees and costs under any statute or written

agreement that allows for the award of such fees, expenses, and costs;

d.      prejudgment and post judgment interest as allowed by law; and

e.      such other relief as the Court deems just and proper that is consistent with

the claims pleaded and within this Court's in personam jurisdiction.

Respectfully submitted,

**GORDON DAVIS JOHNSON SHANE
& SNIDER, P.C.**
4695 North Mesa St.
El Paso, Texas 79912
Tel: (915) 545-1133
Fax: (915) 545-4433
redwards@eplawyers.com

March 24, 2026

/s/ Rob Edwards
**ROB EDWARDS**
State Bar No. 24058290
Attorneys for Petitioner